**BRADSON MERCANTILE, INC., Plaintiff,**

v.

**VANDERBILT INDUSTRIAL CONTRACTING CORPORATION, Total Plant Maintenance, Inc., Centrig Industries, Inc., Monroe R. Meyerson, Leila M. Meyerson, David Meyerson, Stuart Meyerson, Kenneth Lindlau, and Carolina Food Processors, Inc., Defendants.**

No. 3:93–CV–113–P.

United States District Court, W.D. North Carolina, Charlotte Division.

April 14, 1995.

James L. Bruner, Charlotte, NC, Alice Carmichael Richey, Columbia, NC, for plaintiff.

James C. Smith, Anthony L. Giordano, Charlotte, NC, for defendants.

### ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on Defendant Leila M. Meyerson's Motion, filed July 15, 1994, for entry of summary judgment. Defendants David Meyerson, Stuart Meyerson and Kenneth Lindlau jointly filed their motions for summary judgment on July 21, 1994. Plaintiff filed a response to the summary judgment motions on August 12, 1994. A separate reply memorandum from each of the Defendants was filed on September 2, 1994. The Court also held a hearing in this matter on November 4, 1994, regarding Defendants' motion to dissolve a portion of a Consent Order of Injunction. The Court has reviewed the motions for summary judg-

ment and the briefs in support of them, each party's responses and additional memoranda, and the relevant legal authorities. Based upon its review of this case, the Court makes the following findings of facts and conclusions of law.

### THE ALLEGATIONS

Plaintiff, Bradson Mercantile, Inc., ("Bradson"), brought this action against the Defendants, alleging claims for breach of contract, breach of fiduciary duty, trust fund, conspiracy, tortious interference with contract, indemnity, fraud, successor-in-interest, and equitable subordination.[1] Defendants have filed counterclaims against the Plaintiff for its alleged failure to properly perform its contractual obligations owed to Vanderbilt.

These allegations arise from an Agreement entered into between Bradson and Defendant Vanderbilt Industrial Contracting Corporation ("Vanderbilt or VICC") on February 27, 1992. Bradson is a Tennessee corporation engaged in the business of furnishing personnel services to various industries, including contractors on industrial construction projects, in the United States and Canada. Vanderbilt, a Delaware corporation with its principal place of business in Charlotte, North Carolina, was engaged in the industrial contracting business.

As a threshold matter, Plaintiff alleges that:

1. By virtue of their actions and representations with respect to each other, with respect to CENTRIG, VICC and RERI, and with respect to third parties, Monroe and Leila were *de facto* partners ... in the business of CENTRIG, VICC, RERI, TPM and SWEET LADY. Additionally, ... Monroe, as agent, acted for Leila, as principal. Leila, as principal, received and retained benefits from the agreement between VICC and Monroe, on one hand, and the Plaintiff, on the other.... As co-partners, Monroe and Leila were agents for one another.

1. On March 7, 1995 the Court granted Plaintiff's motion to amend the complaint and add party defendants.

2. CENTRIG so dominated and controlled its subsidiaries VICC and RERI that [they] were in reality the "alter-egos" or mere instrumentalities of CENTRIG. CENTRIG used this control to cause specific harm [and damage] to the Plaintiff through the perpetration of wrongdoing, fraud and a violation of VICC's positive legal duties to Plaintiff under their agreement. . . .

3. CENTRIG [and its subsidiaries] was so dominated and controlled by Monroe and Leila as co-partners and agents for each other . . . so as to make CENTRIG a mere instrumentality or "alter-ego" of these individuals and a shield for their activities. . . .

4. TPM is the successor in interest to or "mere continuation" of VICC and the "alter-ego" or instrumentality of Leila and her co-partner Monroe by virtue of their domination and control of the company and their use of the company to perpetrate unjust and dishonest acts.

(Plaintiff's Amended Complaint, ¶¶ 6, 10, 11, 12, 44–45.) According to the Plaintiff's brief, they have sued the corporate Defendant Vanderbilt primarily for breach of contract and the other Defendants on that claim and several other claims,

because their manner of operation of the family business and conduct in transferring assets and opportunities of the corporate defendant Centrig and VICC to themselves, should subject them to liability as the partners or principals of one another and the alter-egos of, or successors to, VICC.

Plaintiff's Reply Brief, p. 3.

Based, in part, on these general allegations Plaintiff essentially argues that Monroe, Leila, and David are each liable for breach of contract under partnership and principal-agency rationale. Plaintiff asserts that Monroe, Leila, David and Stuart breached their fiduciary duties to the Plaintiff because of their joint and several actions, and with respect to David and Leila, because of the acts of their co-partner and agent Monroe. Plaintiff also asserts that David, Stuart, Lindlau, and Leila, through her co-partner/principal relationship with Monroe and because she benefitted from the acts of these individuals, conspired with Monroe to misrepresent the financial condition of VICC to the Plaintiff, while at the same time they were engaged in a conspiracy to transfer the assets of VICC to themselves and others, all to the detriment of the Plaintiff. Furthermore, Plaintiff claims David, Stuart, Monroe and Lindlau tortiously interfered with the contract and transferred corporate assets for the benefit of Leila and Total Plant Maintenance ("TPM").

Specifically, Plaintiff further alleges the following claims:

1. That Monroe and Leila, with the knowledge, consent, cooperation or assistance of Stuart, David and Lindlau caused substantial company assets to be transferred to themselves . . ., [thus] aggravating the financial difficulties of CENTRIG and VICC [and] instead of depositing contract proceeds into the trust account in accordance with the services agreement [they] paid [those monies] to themselves or to [ ]third parties for their benefit.

2. That Monroe, Leila, David and Stuart caused certain assets which remained in VICC and RERI to be transferred to TPM for inadequate or no consideration, outside the ordinary course of business and without provision for creditors.

3. During the course of negotiations between Bradson, Monroe and Stuart, Monroe represented that VICC was financially sound and it is undisputed that he personally guaranteed VICC's payment obligations. Subsequently, when periods of non-payment occurred Monroe and Stuart assured Bradson that non-payment was a temporary problem; VICC was financially sound; and, Bradson would be paid.

4. It is undisputed that a trust account was established, in part, to make payments to Bradson. Plaintiff alleges that Monroe caused VICC to divert funds from the trust account.

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (West 1994). Summary judgment must be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id., Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). To attain summary judgment, the movant bears an initial burden of demonstrating no genuine issues of material fact are present. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who must point out specific facts which create disputed factual issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The ultimate inquiry of the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

In evaluating a summary judgment motion, district courts must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds could recognize as real factual disputes." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). However, when there are disputes over the sufficiency of evidence establishing the facts that control the application of a rule of law, summary judgment is an inappropriate means of deciding the issue. Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence from the entire record could not lead a rational fact finder to rule for the non-moving party. *Matsushita Electric Industrial Co.,* 475 U.S. at 587, 106 S.Ct. at 1356, *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (1986).

### FACTUAL BACKGROUND AND DISCUSSION

1. In February, 1992, Bradson entered into an Agreement with VICC under which Bradson provided skilled labor to VICC for various construction projects. Neither Davis, Stuart, Lindlau or Leila personally signed the Agreement with Plaintiff.

2. Monroe personally guaranteed the payment obligations under the terms of the Services Agreement and a trust account was established to distribute contract payments.

3. Centrig was a holding company for several wholly owned subsidiaries including VICC, Centrig Industrial Contracting (CICC), and Riggers Equipment Rentals, Inc. (RERI).

4. RERI held all of the equipment utilized by VICC or CICC for the construction projects.

5. Monroe Meyerson was the President, Chairman of the Board and sole shareholder of Centrig.

6. Leila is the CEO and sole shareholder of TPM. TPM was incorporated in 1991 with Stuart Meyerson as its President. TPM was partially capitalized with Forty–Four Thousand Thirteen Dollars ($44,013.00) received from Vanderbilt.

7. Stuart Meyerson was Vice President of VICC.

8. Kenneth Lindlau was Chief Financial Officer for Centrig, VICC and RERI.

9. VICC went out of business and ceased operations in December, 1992.

Beyond these undisputed details, there are a great many factual matters which are intensely disputed by the parties. At the forefront of the case is the factual dispute concerning the entire relationship between the family members themselves and the corporations. In short, Plaintiff alleges that Leila, Stuart, David and Lindlau are all liable for the breach of contract, breach of fiduciary duties and the fraud claims as a result of their unique relationships with Centrig and its subsidiaries and, most importantly, Monroe Meyerson. In making this argument Plaintiff argues that all the corporate entities were essentially disregarded and that each corporation is a mere alter-ego of Monroe.

## A. *Leila Meyerson* [2]

Regarding Leila Meyerson, Monroe Meyerson's wife, Plaintiff argues that she was either the principal of Monroe or his partner in connection with the business enterprises. For her part, Leila claims (1) no involvement with VICC's business; (2) no knowledge of any conspiracies to misrepresent VICC's financial condition or to transfer assets to herself or TPM; (3) that she loaned millions of dollars to the corporations, including VICC; and, (4) that any payments she received were for valid debts and the companies are still indebted to her. Notably, as demonstrated with greater specificity in this Court's Preliminary Injunction Order, filed March 22, 1995, Leila's own affidavits and documents in support of her claims are so full of inconsistencies as to do little to support her argument for summary judgment.

There has been much evidence presented in support of the theory that Leila and Monroe were co-partners and that they had some form of alternating principal-agency relationship. This relationship began sometime in 1987 when Mrs. Meyerson first mortgaged her apartment in order to obtain a $500,000 loan which was admittedly obtained for the

direct benefit of Centrig and Vanderbilt. *See* Mrs. Meyerson's Aff., No. 2–Part I, p. 13.[3] This loan, like every other alleged loan made by Leila, was not evidenced by a promissory note from Monroe to Leila or from Centrig to Leila. Apparently such "loans" were recorded in a separate shareholder loan account because Monroe Meyerson did not want them separately "set-up on the books" and he figured that was "really nobody's business." (*See* Preliminary Injunction Hrg. Tr. hereinafter ("Tr."), p. 90, lines 11–15.) These loans were considered outside the normal scope of business. (Tr. p. 91, lines 9–15.) In this instance, the "loan" was subsequently discharged by Monroe Meyerson when he converted it to equity as a capital contribution.

Mrs. Meyerson testified that Monroe was the conduit by which she loaned money into Centrig. The evidence suggests that it worked both ways as VICC, through Monroe, apparently transferred certain stock rights in Shelby Tissue to Sweet Lady, Ltd., owned by Leila, because "we wanted her to have it." Oddly, this transfer is cited by Defendants as a red herring because the transaction never occurred. However, whether or not the stock transfer diverts attention from the real issues, the Court finds that Defendants' testimony on this point is at odds with one another.

The Court is not persuaded that documentation which purports to "pledge" the stock to General Electric Capital Corporation excludes the possibility that other shares were transferred to Sweet Lady or that the same shares were similarly pledged to Sweet Lady at another time. Monroe states the stock was transferred to Sweet Lady and Stuart states it was not. Stuart's and Monroe's testimony is directly at odds thus raising another factual dispute which may be material to demonstrating the full extent of the

---

**2.** Much of the factual disputes surrounding Leila Meyerson have been previously addressed by the Court in its Preliminary Injunction Order, filed March 22, 1995. Accordingly, the Court directs the parties to read that document in conjunction with this Order as there may be significant overlap, cross-referencing and additional related factual findings found within it.

**3.** It is unclear from the record whether the entire $500,000 was loaned to the company or some lesser amount. *See* Preliminary Injunction Hrg. Tr. p. 8, suggesting only $350,000 was transferred to the business.

relationship between the corporate entities and the family members.

Mrs. Meyerson's own transactional summary indicates that payments were made to Lincoln Savings Bank in 1989 and early 1992, (*see* Mrs. Meyerson's Aff., No. 2—Part 1, Exhibit A), and it is "likely" that these payments were made by Centrig on the mortgage held by Lincoln Savings Bank. At least two of these payments appear on the shareholder loan account document with the explanation "MRM Mortgage Payment." (*See also,* Tr. p. 110, lines 3–8; p. 116, lines 4–11—testimony of Ken Lindlau, Centrig CFO, that they could very likely be mortgage payments and that the mortgage on the apartment was paid on several occasions).

The evidence suggests that, from 1989 through mid–1992, before Mrs. Meyerson obtained any interest in the Nationsbank Loans, she received checks from Centrig for a variety of purposes, including the payment of numerous personal expenses, tax liens to the IRS, and mortgage payments to Lincoln Savings Bank, at a time when the companies were in dire financial straits and approaching insolvency. It is alleged that money was diverted from Bradson projects with VICC to pay these debts and expenses, in particular Monroe's and Leila's personal tax liability.

Given the state of the accounting records and the extensive commingling of funds it is not, at present, clear whether or not such a direct transfer occurred. However, it is clear that money coming into Centrig's corporate accounts, which was almost exclusively from VICC projects, (*see* David Meyerson Dep., p. 82, lines 4–8) of which Plaintiff was one, may very well have been used to pay the Meyersons' IRS bill and other expenses. Furthermore, given the likelihood that Plaintiff's money was used directly, it would be wholly unfair to allow Defendants' perplexing and incomplete accounting customs to prevent Plaintiff from moving forward to further demonstrate the connection at trial and allow all reasonable inferences to be drawn from these circumstances by a jury.

Although Mrs. Meyerson claims to have made numerous capital contributions and "loans" to the companies, including VICC, the documentary evidence to support these claims is wholly inadequate. As noted in the Preliminary Injunction Order,

> There is little or no documentary evidence to support her claims that that amount of money was actually transferred to any Centrig accounts, or that any money that was placed in a Centrig account remained there for legitimate business purposes. Nor is there any documentary evidence which demonstrates that the corporations received credit toward any of Mrs. Meyerson's alleged loans. In support of this inference the Court refers again to the December 1992 Shareholder Loan document which illustrates that in the six month period, between January and June 1992, prior to Mrs. Meyerson's acquisition of the Nationsbank Loan, nearly $220,000 was transferred to the personal accounts of Leila and Monroe Meyerson.

Preliminary Injunction Order, p. 6. The Court noted further that

> Even if Mrs. Meyerson loaned the entire amount she alleges, her own transactional schedule, when read in conjunction with her affidavit, suggests that the corporate accounts were nothing more than a "personal checkbook" for the Meyerson family from which they could make endless unaccounted for withdrawals without the worry of reconciling the balance with alleged deposits.

Preliminary Injunction Order, p. 7.

The co-partner/principal-agent business relationship between Leila, Monroe, and the corporations, is further demonstrated by the buy-out of the Nationsbank loans. It appears that Monroe directed and controlled this transaction in order to get himself and the companies out from under the burden of the Nationsbank debt. By her own account, Mrs. Meyerson testified that

> In June of 1992, my husband advised me that the Nationsbank Loans were in default and that Nationsbank had filed a lawsuit to collect this indebtedness from Centrig and its subsidiaries, including Vanderbilt, and from my husband [Monroe Meyerson], who had guaranteed the Nationsbank Loans.

(*See* Mrs. Meyerson's Aff., No. 2–Part I, p. 9.) At her husband's request she agreed to obtain a loan which proceeds would be used to purchase the Nationsbank Loans. On June 29, 1992, Monroe and Leila Meyerson together borrowed $590,000 from Banco Mexicano. Mrs. Meyerson states that

> The Banco Mexicano Loan funds were borrowed for the specific purpose of purchasing the Nationsbank Loans, to get those loans out of the hands of a very hostile creditor (Nationsbank) and thereby allow Centrig, Vanderbilt and the other subsidiaries to continue in business. Thus, my husband and I entered into the Banco Mexicano Loan for the benefit of Centrig and its subsidiaries.

(*See* Mrs. Meyerson's Aff., No. 2–Part I, p. 10.) She also stated that she participated in the Nationsbank Loan transaction because "the bank was making it impossible for business to function and the choice was to buy out the loan ... and so, I made it possible." (Leila Meyerson Dep., p. 120.) She further states that she "thought it was the best decision ... because the bank would no longer make things so difficult on *our cash flow* and I was delighted to participate and help." *Id.* at 127 (emphasis added).

It is undisputed that at Monroe's direction, Mrs. Meyerson appointed Sidney Kastenbaum to act as her agent for the loan purchase transaction with Nationsbank and that Nationsbank was unaware that Sidney Kastenbaum was acting as an agent for Leila Meyerson. (Tr. p. 35.)

The Court previously found that "there was complete commingling of family and corporate funds such that there is no way to determine which loans, if any, were being reduced by the payments." (Preliminary Injunction Order, p. 12.) The record reflects, indisputably, that Centrig paid $65,343.00 directly to Banco Mexicano in October, 1992, four months after she acquired the Nationsbank Loans. (*See* Tr. p. 3, lines 5–7; p. 6, lines 17–18; p. 7, lines 11–13.) Defendants assert that any payments made by Centrig to Mrs. Meyerson were "merely partial payments against the Nationsbank Loans purchased by and assigned to Leila." However, as noted in the Preliminary Injunction Order:

nowhere on the Shareholder Loan account documentation, which Defendant Lindlau, the corporate Chief Financial Officer described as accurate and pretty complete, was there any indication of the Nationsbank Loan or any reflection of these payments being credited toward reduction of those loans. *See* Preliminary Injunction Hrg. Tr., p. 92, lines 13–22 and Michael Dale Simpson Statement, Exhibit A. [In fact,] there is no record that the corporate debt was accurately and appropriately reduced in any way or that Mrs. Meyerson ever applied those payments toward that debt. Rather, the evidence shows that Mrs. Meyerson applied the money directly toward her personal debt with Banco Mexicano. In fact, her own affidavit confirms this—"The Nationsbank Loans remain unpaid."

Preliminary Injunction Order, p. 10–11.

The wholly interconnected business relationship between Leila, Monroe, David and Stuart is also demonstrated by the formation, capitalization and use of another corporation—TPM. According to TPM's President, Stuart Meyerson, Monroe had no involvement in TPM. This statement is questionable given that TPM was incorporated with Mrs. Meyerson as its sole shareholder at Monroe Meyerson's request. (Tr. p. 58, lines 10–12.) Specifically, Leila states that Monroe came to her and asked if she would be willing to be the owner of TPM so that "we would not lose this West Vaco [contract]."

This relationship is significant as it is alleged that assets of VICC and RERI were transferred to TPM and that TPM was a successor in interest to VICC. Clearly the circumstances surrounding the transfer of $92,000 worth of equipment from RERI to TPM are material and in dispute. The Court finds that, at least at first glance, the transaction appears to have lacked adequate consideration. The Court previously opined that

> this maneuver, which, in light of the business and personal relationship between the Meyerson family members, appears to be nothing more than a reincorporation, was successful in defeating at least some of Centrig's creditors. Finally, while the actual ownership of the assets may have

---

changed hands, it is apparent from the testimony that the management and control of those assets remained in the hands of Monroe Meyerson.

Defendants provide no documentary proof whatsoever to support their claim that RERI in fact received a $92,000 debt reduction as a result of the transaction and this statement conflicts with Mrs. Meyerson's sworn affidavit which states that the Nationsbank Loans remain unpaid.

There has also been testimony that the claim and delivery action, brought on behalf of Leila's agent Sidney Kastenbaum, was directed by Monroe Meyerson for the benefit of Leila and Monroe in order to obtain valuable assets. (Tr. p. 54.) This further belies the notion that Monroe was not involved in TPM's business. There is also testimony that Leila knew about the transfer or acquisition of assets through the claim and delivery action, and that she was indisputably involved in the circular transaction involving the transfer of equipment from RERI to TPM, having borrowed funds and written two checks for that purpose.

In addition to these asset transfer transactions there are other evidentiary links directly between Leila, TPM and the corporations, including VICC specifically. For example, despite Defendants' claims that TPM was not partially capitalized with VICC's money because the money was used to pay VICC's debt, the records simply do not show that the liabilities were actually paid. In fact, a report generated on February 18, 1993 indicates that no payments were made on any of the liabilities of VICC. (*See* John Huit Dep., Exhibit 8, p. 2.)

Furthermore, there is complete disagreement concerning whether the West Vaco contract was transferred from VICC to TPM for no consideration. And while it is not disputed that Stuart Meyerson "handled those transactions," there is a dispute as to Leila's knowledge and involvement in those transfers.

There are several other self-serving and unsupported assertions made by the Defendants with regard to the flow of money into and out of the Centrig/Vanderbilt corporate accounts which raise the specter of impropriety and add weight to Plaintiff's contentions that the Meyersons, including Leila, were using the corporate accounts as their personal checkbooks. (*See* Preliminary Injunction Order at p. 13–18 (examples include the "Artwork" loan, Saligman loan, and payment of IRS personal tax liability)).

The Court previously addressed the Defendants' use of the corporate accounts as their "personal checkbooks" in its Preliminary Injunction Order, stating that:

> Despite the sizeable gap in the records and account information of the Defendant corporations, Plaintiff has sufficiently demonstrated that monies which came into the companies, allegedly to be deposited into a trust fund from which the Plaintiff was to be paid, were instead commingled with Monroe and Leila Meyerson's personal funds and used for their benefit. As alleged, this use [may have] constituted a breach of contract, fiduciary duties associated with the trust account, fraud and conspiracy.

Preliminary Injunction Order, p. 23. Furthermore, the Court noted that:

> Each of these claims are attributed to Leila as principal and co-partner of her son, David Meyerson and Monroe. The record and testimony exposes substantial commingling of corporate and personal funds, essentially all of which was conducted without appropriate accounting methods and adequate recordkeeping. The record reveals that this relationship between the company and [Mrs. Meyerson's] apartment, as well as the Meyerson's continuous commingling of funds, began years before Mrs. Meyerson became a primary secured creditor.

Preliminary Injunction Order, p. 23–24. Specifically, the Court found that

> the record, including Mrs. Meyerson's affidavit, make it abundantly clear that she has been substantially involved in the conduct of Centrig and Vanderbilt's business activities by, among other things, using her Apartment as a *de facto* asset of the company to fund the acquisition of the NationsBank Loans thus placing herself in the position of a first priority secured creditor

and *de facto* owner and co-partner of all the companies' assets.

Preliminary Injunction Order, p. 18–19. There has also been testimony bearing on Leila's control over the companies. Certain corporate accounting personnel testified that she frequently called employees and officers of the companies to have money transferred to various personal accounts. (*See* Sworn Statement of Anne Dubose, p. 15–18; Sworn Statement of Betty Nickels, p. 24–25; Tr. p. 37–39.)

In analyzing the Plaintiff's likelihood of success on the merits the Court previously commented upon Leila's overall liability and the business relationship between Monroe, Leila, Stuart and David. The Court opined that

the Plaintiff has raised substantial and serious questions concerning Leila's overall liability, particularly in light of the apparent business relationship between Monroe, Leila, and the other family members. *According to Mr. Lindlau there was no distinction made between Monroe and Leila with respect to monies advanced to the companies.* This observation is substantiated by the December 1992 Shareholder Loan document which illustrates that numerous payments were made from the corporate account to Leila and Monroe without distinguishing, in any way, which alleged "loan" fund the money came from. Without such a reconciliation, it appears that the corporation could never receive proper credit for monies paid on those loans. The same can be said of the direct payment to Banco Mexicano.... [T]hat mortgage payment on the apartment was for her direct benefit and there is no indication in the record that the corporation ever received credit against their debt for that payment. The record is also clear that Bradson was performing contracts for Vanderbilt at this time. Accordingly, the Court concludes that Mrs. Meyerson benefitted from the contract ... because payments were being made to Leila, or on her behalf, at the expense of Bradson.

Preliminary Injunction Order, p. 26.

In sum, the record contains substantial evidence that (1) Leila was involved in the business affairs of the corporations; (2) she exercised some degree of control over the corporate accounts, which were seemingly indistinguishable; (3) she may have substantially benefitted from her relationship to the corporations; (4) her corporation, TPM, may have been the recipient of VICC's assets, including cash, a viable contract and other assets, all to the detriment of the Plaintiff; and, (5) in light of her relationship with Monroe and her sons in running these closely held family businesses, there appear to be substantial and serious questions as to her liability as a principal, an agent, and as a co-partner to Monroe, David and Stuart.

### B. *David and Stuart Meyerson and Kenneth Lindlau*

In addition to the facts and disputed evidence attributable to David, Stuart and Lindlau set out above, the following information was also considered by the Court. First, the record reflects several factual disputes which must be resolved at trial regarding alleged misrepresentations made by Monroe and Stuart to certain Bradson executives regarding the financial condition of VICC.

Second, David's claims to have never been an "employee, officer, director or shareholder of Centrig or Vanderbilt" at any time after 1989 are also disputed. Several letters, co-defendant testimony, David's own resume, and his actions, seemingly contradict his contention. A letter to Home Savings of America, dated December 28, 1992, states that

"[m]y father ... offered me the opportunity to invest $200,000 with Centrig.... At Shearson Lehman Brothers I was employed by an intermediary who provided acquisition/divestiture, capital formation and, in general, treasury services to principals while *at VICC I am employed directly by the principal to provide the same services.*"

(Plaintiff's Appendix, filed August 12, 1994, Exhibit 15.) Another letter from CFO Kenneth Lindlau states that

[VICC] hired, effective as of November 1, 1992, David Scott Meyerson as Director of Corporate Development at a salary of $150,000 per year plus bonus.... Mr.

Meyerson will be responsible for our acquisition-divestiture program, capital formation and corporate restructuring as well as most of the other functions of our treasury department. *Id.* David's resume also indicates his executive status with VICC. (Plaintiff's Appendix, filed August 12, 1994, Tab 15.) Ken Lindlau testified that "David Meyerson was the one that was in charge." (Lindlau Dep., p. 120–122.) The Court finds that, together with other family members, the record supports Plaintiff's claim that David Meyerson may have done a great deal of restructuring, divesting, and other functions which may have adversely affected the treasury of the companies to the detriment of its creditors, including Bradson.

It is also undisputed that David loaned Leila the money to initiate the $92,000 circular transaction which resulted in RERI's assets being transferred to TPM and that she subsequently paid him back the same $92,000. There is also evidence that numerous personal bills and expenses were paid on behalf of David and Stuart, however, it is disputed whether or not and to what extent these payments were in fact authorized business expenses or whether they were repayment of a valid debt. Here, again while there is documentation indicating various loans to the companies on their behalf, the documentation fails to demonstrate which accounts received the money; if they were in fact loans or capital contributions; and, how the alleged loans were administered and accounted for by the corporations.

Stuart testified that during the last few months of 1992 he requested that David join the company. At that time, Stuart, David, Ken Lindlau and Dennis Burling were making the decisions for the business. (Stuart Meyerson Dep. p. 164, lines 3–18.) As noted above, by his own admission, Stuart handled the asset transfer between RERI and TPM. What remains unclear is whether he handled that transfer as Vice President of VICC or President of TPM. No one seems to have represented RERI and that corporate entity appears to have received no consideration for its assets. Stuart also negotiated for the transfer of the West Vaco contract from Van-

derbilt to TPM. (*See* Plaintiff's Appendix, filed August 12, 1994, Exhibit 12.) It is disputed whether or not any consideration was paid to VICC for the West Vaco Contract. Lastly, there is a dispute concerning Stuart's representations to Lindsay Rivard and David Hamilton of Bradson regarding VICC's financial stability and whether Monroe diverted money from the Pomini Project joint account. (*See* Rivard Dep., p. 21–27.)

In short, the liability of Ken Lindlau hinges on his position of CFO and his apparent knowledge of all or most of the transactions described above. It is clear from the record that he was involved in many of the corporate business decisions from 1989 through December, 1992 and was responsible for the financial records of the corporations during the relevant time period. While Lindlau denies any knowledge of the West Vaco contract transfer and the RERI equipment transfer, there is evidence that he authorized and instructed corporate accounting personnel under his supervision to pay Leila and Monroe Meyerson money from the corporate accounts while other vendors and creditors went unpaid. The legitimacy of such payments are at the heart of this lawsuit and properly left for trial. (*See* Betty Nickels Statement, p. 22–24.)

### LEGAL DISCUSSION

Properly used, summary judgment helps strip away the underbrush and lay bare the heart of the controversy between the parties. Simply put, the mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.

As documented above, the Court finds that this case is riddled with material factual disputes which might legitimately affect the outcome. *See Anderson, supra.* Many of Plaintiff's claims raise substantial questions of fact involving the conduct of the parties. In particular, questions have been raised concerning the actions of the individual named Defendants with respect to their management and control of both the predecessor corporations (Centrig, VICC and RERI) and the successor corporation, TPM. *See Florom v. Elliot Mfg.,* 867 F.2d 570, 575–576 (10th Cir.

1989). Generally, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, when conflicting evidence must be weighed, a full trial is clearly necessary.

In this case there are several issues which need to be analyzed in order to determine whether summary judgment is appropriate. Prior to deciding these issues, the Court must consider Plaintiff's allegations involving the alter-ego doctrine and the instrumentality rule which compel piercing the corporate veil.

## A. Piercing the Corporate Veil

On this issue the Court previously stated that

It is well settled that under the alter-ego doctrine and the instrumentality rule the court may disregard the corporate entity and hold individuals responsible for acts done in the name of the corporation. Further, the Court can fasten liability on the individual who uses the corporation merely as an instrumentality in conducting his or her own personal business. Such liability springs from fraud perpetrated not on the corporation, but on the third party dealing with the corporation, in this case, the plaintiff.

Preliminary Injunction Order, p. 29.

This Court also stated that

the Defendants, including Mrs. Meyerson, cleverly used corporate devices to further their own interests and that the assets of the defendant corporations may very well have been obtained as a part of the overall scheme to defraud perpetrated by the Meyerson family. Their actions demonstrate a pattern of insider dealings, intercorporate and insider borrowing, and transfers of corporate contracts and assets.

Preliminary Injunction Order, p. 27. This Court finds the reasoning of the Fourth Circuit in *National Carloading Corp. v. Astro Van Lines,* 593 F.2d 559 (4th Cir.1979) (discussed fully in the Preliminary Injunction Order), to be controlling on this point. Specifically, the Fourth Circuit noted that

where all of the assets of one corporation are transferred to another corporation, and both corporations are under the same ownership, management, and control, the transferee corporation may be held responsible for the debts of the transferor if there was no consideration for the sale, or if it was not in good faith but for the purpose of defeating the creditors of the selling corporation, ... or where the transaction amounts to a mere reincorporation or reorganization of the selling corporation. *Payne–Baber Coal Co. of Kentucky v. Butler,* 276 Ky. 211, 123 S.W.2d 273 (1938).

*National CarLoading Corp.,* 593 F.2d at 563.

The Fourth Circuit Court added that

the transfer of assets strips the debtor corporation from earning money to pay its debts, thus leaving creditors and holders of claims no resources to which they may look for the payment of their due. (citations omitted).

In this case, the circumstances surrounding the asset transfer and the transfer of the West Vaco contract to TPM raises a genuine material issue: whether the Meyerson's stripped the Centrig–VICC–RERI corporation leaving a legitimate creditor, Bradson, and others, without a remedy for payment.

■ In North Carolina it is settled that where a corporation is controlled in a way that "[i]t is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State, the corporate entity will be disregarded, and the corporation and shareholder treated as one and the same person ...." *Clark v. B.H. Holland Co., Inc.,* 852 F.Supp. 1268 (E.D.N.C.1994); *citing Henderson v. Security Mortg. & Finance Co.,* 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968).

■ The test for determining whether a corporation is a "mere instrumentality" under North Carolina law consists of three elements: (1) the domination and control of the corporate entity; (2) the use of that domination and control to perpetrate a fraud or wrong; and (3) the proximate causation of the wrong complained of by the domination and control. *Clark v. B.H. Holland Co., Inc.,* 852 F.Supp. at 1276; *see Atlantic Tobacco*

*Co. v. Honeycutt,* 101 N.C.App. 160, 164, 398 S.E.2d 641, 643 (1990).

Here, there has been substantial testimony and documentary evidence which raise genuine questions of material facts concerning both Centrig's domination of its subsidiaries and the Meyersons' (Leila, Monroe, David and Stuart) total control of Centrig. As discussed below, there is also sufficient evidence of fraud and wrongdoing caused by the Meyersons' disregard of the corporate entity.

Lastly, this Court also relied upon the Fourth Circuit decision in *Dewitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976), which applied a similar test for piercing the corporate veil and noted that

> when substantial ownership of all the stock of a corporation in a single individual [or closely-held corporation] is combined with other factors clearly supporting disregard of the corporate fiction on grounds of fundamental equity and fairness, courts have experienced "little difficulty" and have shown no hesitancy in applying ... the "alter ego" or "instrumentality" theory in order to cast aside the corporate shield and to fasten liability on the individual stockholder.

*Dewitt,* 540 F.2d at 685 (citation omitted).

Some of the factors previously discussed by this Court included the gross undercapitalization; complete domination of the corporate entity; failure to observe corporate formalities; siphoning of funds by the dominant stockholder; absence of corporate records; and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

■ In consideration of those factors here, the Court remains convinced that Plaintiff has presented substantial evidence which compel submitting the question of piercing of the corporate veil to the jury. Here, the record reveals that the debt owed by the corporation to its shareholders is large in relationship to its capital structure. There is evidence of complete control and domination of the corporate entity by Monroe Meyerson and his family. The record reveals substantial commingling of funds; incomplete ac-

counting records; and, that the corporations were merely an adjunct of Monroe, Leila and their sons. As such, it remains an issue whether the jury will disregard the corporate entity and hold them responsible for using the corporations merely as an instrumental in conducting their own personal business.

■ The Court is also of the opinion that there has been a sufficient showing that the parent corporation, Centrig, ought to be held legally responsible for the obligations of the subsidiary corporations, including VICC. The Court reaches this conclusion based upon its review of the corporate documents in the record. These records indicate that there was little or no distinction between the accounts of the various companies, nor with respect to individual transactions into and out of the corporate accounts. *See* 17A Am. Jur.2d *Contracts* § 424. As such, the Court concludes that there is substantial evidence that the subsidiaries where the alter-ego of Centrig, and further that Centrig and its subsidiaries were merely the "alter-ego" or instrumentalities of the Meyerson family members.

### B. *Breach of Contract Claim*

Based upon the facts as set out above and for the reasons stated *infra,* the Court believes there are genuine issues of material fact regarding the breach of contract claim. Furthermore, whether Leila is vicariously liable under the contract as co-partner or principal, and David liable as a co-partner, under the circumstances alleged here, is also a question of fact. The Plaintiff essentially argues that Leila and David's "unique relationship" with the corporate entities makes them liable. The Court will first address Plaintiff's weaker argument, the principal-agent connection between Monroe and Leila.

#### 1. *Principal–Agent Relationship*

■ Both parties agree that whether a principal-agent relationship exists is a question of fact for the jury only if there is evidence tending to prove that relationship; it is a question of law for the Court if only one inference can be drawn from the facts. *Partin v. Carolina Power & Light Co.,* 40

N.C.App. 630, 637, 253 S.E.2d 605, 611, rev. den. 297 N.C. 611, 257 S.E.2d 219 (1979). Furthermore, under North Carolina law, where some evidence is presented of an agency relationship, agency is a fact to be proved and a question for the jury. *Pacific Southbay Industries, Inc. v. Sure–Fire Distributing, Inc.*, 49 N.C.App. 172, 173, 270 S.E.2d 515, 516 (1980); *Johnson v. Hunnicutt*, 86 N.C.App. 405, 411, 358 S.E.2d 74, 77 (1987). The question for this Court then is whether or not there has been some evidence presented to illustrate that Leila Meyerson was a principal of her husband Monroe or the businesses.

It is well settled that a corporation may act as an agent for an individual, a partnership, or for another corporation. 3 Am.Jur.2d *Agency* § 13. Accordingly, the Court must refine its inquiry to include a determination of whether there is some evidence that Leila was a principal to Monroe, the corporations, or to the *de facto* partnership which Plaintiff alleges existed between Monroe, Leila and David.

On this score, the Court agrees, in part, with the Defendants. Based upon the evidence presently before the Court, it is inadequate to support the notion that Leila Meyerson was acting as Monroe's principal. These companies were, for the most part, under his control and subject to his authority. There is simply no evidence which demonstrates, or from which one might reasonably infer, that Monroe was subject to Leila's control.

■ However, the same cannot be said of the possibility that Leila was a principal to, or an equal strength decision-maker in, the Monroe–Leila Partnership or with respect to the corporations themselves. Here, as discussed more fully below, Plaintiff has presented sufficient evidence to sustain this theory. Leila participated in the decisions made by the *de facto* partnership with her husband and she also exhibited a certain degree of control over the corporations.

Specifically, she admits to having personally made the Nationsbank acquisition "possible." The evidence suggests that she operated solely with Monroe on that acquisition and that she asked Monroe to get an agent for her. She also opined that she "thought [the Nationsbank Loan acquisition] was the best decision ... [for] *our cash flow*...." Leila also communicated with the corporate attorney regarding the progress of the claim and delivery action. Furthermore, she was apparently actively involved in the circular transfer to move assets from VICC to TPM. More importantly, Leila apparently directed accounting personnel at the corporations to pay certain third party debts and other personal expenses on her behalf and for her direct benefit.

The Court finds the case *Dubose Steel Inc. v. Faircloth*, 59 N.C.App. 722, 298 S.E.2d 60 (1982), to be instructive on this point. In that case the court concluded that the wife was personally liable to the plaintiff on a supply contract negotiated by her husband on behalf of the corporation in which he was the sole shareholder and president. The arguably "slight evidence" of the husband's agency relied upon by the court was the wife's retention of certain corporate funds in her personal checking account.

Accordingly, the Court finds that in light of her conduct with Monroe and the corporations, there is sufficient evidence of an agency relationship between Leila, as partner-principal, and both the corporations and the *de facto* partnership, as her agents. *See Pacific Southbay Industries, Inc. v. Sure–Fire Distributing, Inc.*, 49 N.C.App. 172, 270 S.E.2d 515 (1980).

### 2. *Co–Partner Relationship*

■ In any event, Plaintiff's argument that Monroe, Leila and David are co-partners is more persuasive. Plaintiff first directs the Court to *Wilder v. Hobson*, 101 N.C.App. 199, 202, 398 S.E.2d 625 (1990) which, in accord with the North Carolina Uniform Partnership Act, defines a partnership as "... an association of two or more persons to carry on as co-owners a business for profit." (citations omitted). That court also stated that

[The] existence of a partnership does not require an express agreement and the parties' intent to formulate a partnership can be inferred by the conduct of the parties

by examining all the circumstances. *Peed v. Peed,* 72 N.C.App. 549, 325 S.E.2d 275, *cert. denied,* 313 N.C. 604, 330 S.E.2d 612 (1985). "A partnership is a combination of two or more persons of their property, effects, labor, or skill in a common business or venture...." (citation omitted). *Id.* There is evidence of several transactions where Leila and Monroe acted together in order to loan or contribute monies to the corporations. Together they allegedly contributed certain artwork. Together they borrowed monies from Banco Mexicano in order to purchase the Nationsbank Loan which Monroe had personally guaranteed.

On the other hand, as noted above, there is ample evidence which suggests that transfers were made, at Leila's direction and for her benefit, from Centrig and the subsidiaries during the time that a contractual relationship existed between Bradson and VICC. There is no dispute that Monroe, Stuart, David and Lindlau were aware of the contractual relationship with Bradson. More significantly, based upon Leila's and Monroe's conduct, if an implied partnership is found to exist then knowledge of the contractual relationship is imputed to her as well.

The establishment of TPM, the corporation which ultimately received the lion's share of VICC's remaining assets, (the West Vaco contract and cash) is further evidence of the implied partnership relationship that existed between Monroe and Leila. The company was set up with Leila as owner at Monroe's request. As discussed in the Preliminary Injunction Order, Leila's property, including the apartment and artwork were found to be *de facto* company assets.

More importantly, as noted specifically above, there is evidence that Leila personally made the Nationsbank acquisition possible; operated solely with Monroe on that acquisition; participated in the decision to utilize an agent; believed that the acquisition was the best decision for the corporations; had knowledge of and concern over the claim and delivery action; was involved in the asset transfer VICC to TPM; and, had control over various personnel at the corporations. There is ample evidence that Monroe and Leila combined their property, skill and labor under an agreement to share in the "cash flow" into and out of the corporations.

There is substantial evidence that David's and Leila's personal expenses were paid from corporate accounts, that at one point David received a substantial income and perhaps a bonus from the corporation and that he "invested" in the corporation while acting as an officer. In short, there is evidence that David contributed his labor and skill, as well as his money, all for the direct use and benefit of the corporations. *See Johnson v. Gill,* 235 N.C. 40, 68 S.E.2d 788, 791 (1952).

In sum, the Court concludes that there are genuine issues of material fact as to whether David and Leila were co-partners with Monroe and the corporations. It is clear that, if they are determined by the jury to be co-partners, they may be liable for all acts of a co-partner in furtherance of the business of the partnership. *See* N.C.Gen.Stat. § 59–45 (1989). Accordingly, Defendants' motion for summary judgment on the breach of contract claim must be denied.

### C. Breach of Fiduciary Duties Claim

The second claim concerns Leila's, Stuart's, David's and Lindlau's breach of fiduciary duty to Bradson. Defendant correctly notes that in order to prevail on this claim as against Leila, Plaintiff must produce evidence establishing that (1) Leila is either a *de facto* officer or director of Centrig or a principal or co-partner; (2) that the trust fund theory is still viable in North Carolina; and, (3) that the Plaintiff has standing to support a claim under the trust fund theory.

As for David [4], Stuart and Lindlau, all corporate officers during the relevant time

---

4. Despite his claims to the contrary, the Court finds that there is significant evidence which raises a genuine factual dispute as to whether David Meyerson was acting as an officer or director of the Centrig companies in late 1992. Specifically, the Court refers to several letters and a resume in the record which address David as director of corporate development for VICC. There has also been testimony that he was part of the leadership group making decisions for the companies during this time frame. North Carolina recognizes that one may be a *de facto*

period, Plaintiff must show evidence that (1) these Defendants owed them a fiduciary duty; and (2) engaged in conduct which constitutes a breach of that duty. On the former point the Court notes that the fiduciary duty arises from Centrig/VICC's responsibilities to handle the money from the various projects for the benefit of Bradson via the trust account established for the purpose of payment. Such a position necessarily implies a relationship premised upon confidence, trust and good faith between the parties. Furthermore, as to David, Stuart and Lindlau, it is well settled that directors, and officers generally, may be held liable for fraud practiced by the corporation when they cause or participate in the wrongful acts of the corporation, or have constructive knowledge thereof. *See generally, Anderson Cotton Mills v. Royal Mfg. Co.,* 218 N.C. 560, 11 S.E.2d 550 (1940); *Minnis v. Sharpe,* 202 N.C. 300, 162 S.E. 606, *modified,* 203 N.C. 110, 164 S.E. 625 (1932).

■ On the latter point, the evidence establishes that David, Stuart and Lindlau were officers of the various entities which made up Centrig companies during the time that many of the alleged fraudulent transfers took place. Each of them were aware of the contract with Bradson and that VICC's projects, of which Bradson's was apparently significant, were the principal source of income into the company in late 1992. These alleged fraudulent transfers from the corporate accounts to pay personal expenses and tax liens, as well as the asset transfers between VICC and TPM were allegedly taken as alter-ego's of the corporate entities and for the benefit of the Meyerson family. As determined above, there is sufficient evidence to go to the jury on whether Defendants' commingling of assets and control of the corporate entities coupled with the alleged fraud violates the plaintiff's rights.

■ Returning to the inquiry with respect to Leila Meyerson, the Court has also already determined that there is ample evidence that Leila may have been either a *de facto* officer/director and/or principal of the

corporations or a co-partner to Monroe. At a minimum there is evidence establishing her knowledge and involvement in the claim and delivery action and the RERI equipment transfer to TPM, which was, in turn, essential for carrying out the VICC West Vaco contract. That contract was apparently transferred to TPM along with cash capitalization, all allegedly for Leila's benefit as sole shareholder. There is also the aforementioned evidence of her control over numerous transfers involving all of the corporate accounts.

As a threshold matter then, this Court must determine whether Bradson, an unsecured creditor, has standing to assert a claim for breach of a fiduciary duty. Both parties acknowledge that the rules which govern standing in such a circumstance are principally derived from two decisions, *Underwood v. Stafford,* 270 N.C. 700, 155 S.E.2d 211 (1967) and *Ford Motor Credit Company v. Minges,* 473 F.2d 918 (4th Cir.1973).

■ Drawing on several North Carolina cases, the Court in *Ford* established the following rules for a creditor's standing to sue a corporate director for fraud or negligent mismanagement:

1. Where a creditor of a corporation has sustained an identifiable loss peculiar and personal to himself by reason of the fraud or negligent mismanagement of the corporation's business by its directors, he has a cause of action against the directors for his personal loss, and such recovery will inure to him personally and not to the other creditors of the corporation.

2. Where the alleged fraud or negligent mismanagement has resulted in loss to the corporation and its creditors generally, the right of action belongs to the corporation and it may be maintained only in the name of the corporation or its receiver if it is insolvent. It is only where the corporation or its receiver declines upon request to bring the action that it may be maintained

*officer* of a corporation and as such may be liable as a corporate fiduciary. *See Lowder v. All Star Mills, Inc.,* 75 N.C.App. 233, 330 S.E.2d 649,

*discretionary rev. denied,* 314 N.C. 541, 335 S.E.2d 19 (1985).

by an individual creditor, but even then the proceeds of any recovery are held for the benefit of all creditors of the corporation.

The rationale behind the *Ford* and *Underwood* decisions is simple. They hold that a creditor may not bring an individual action against the fiduciaries unless the claim involves a loss which is "peculiar and personal" because to do so would leave defendants vulnerable to multiple liability and allow a single creditor to recover from a fund which rightfully belongs to all creditors similarly situated. In order to avoid these problems, such actions should be brought in the name of the corporation for the benefit of all persons entitled to participate in the recovery. Bradson has not brought this action on behalf of all creditors, nor have they made the proper request to bring such an action.

 Accordingly, the narrow issue before the Court is whether Bradson has sustained an identifiable loss "peculiar and personal" to itself by reason of some special circumstances or special relationship to those who committed the fraud or negligent mismanagement. On this score, Plaintiff contends the principles espoused in *Ford* grant Bradson standing to sue to recover losses resulting from the following: (1) VICC's complete disregard of Bradson's rights; (2) the Defendants' tortious interference with Bradson's contract; (3) Defendants' failure to deposit funds received by the corporation from VICC projects into the UCB account (trust fund); (4) the transfer of over $300,000 to Leila during the time Bradson remained unpaid, and at a time when Centrig was insolvent and VICC projects, including Bradson's, were the main source of income; and, (5) the breach of contract claim against corporate directors that injured Bradson and not the corporation.

Plaintiff's argument on this point is persuasive. Plaintiff has demonstrated that a basis exists to support its claims of an individual loss which is separate and distinct from any damage suffered by the corporation. This is particularly significant in cases like this one, involving a small closely-held family corporation where it is difficult to distinguish between the corporate accounts and the individual accounts of the directors and stockholders. Essentially, the corporation, the shareholders, the directors and the alleged wrongdoers are one in the same. Under these circumstances, it is far more likely that the persons exposed to loss by corporate misconduct are those who do business with it, the corporate creditors. This Court is of the opinion that in such a situation it may be proper to pierce the corporate veil, via the alter-ego/instrumentality doctrines, against the officers or directors of the corporation on the theory that the officers committed the wrongful act to the creditor. There is substantial evidence that Defendants failed to deposit funds from VICC projects into the trust account and that hundreds of thousands of dollars were transferred to the Meyerson family at a time when the corporations were approaching insolvency.

Here, the Court finds that the creditor, Bradson, may maintain an action against corporate fiduciaries for breach of a duty because that duty was owed primarily to Bradson rather than the corporation. Such a cause of action is recognized in accordance with the North Carolina Supreme Court's decision in *Underwood* and the Fourth Circuit's decision in *Ford*. Particularly in light of the evidence alleging fraudulent trust fund account transfers and misuse, the Court concludes that Plaintiff may have been harmed directly by the fiduciaries' actions. That personal action by the fiduciaries established the connection, akin to a duty, between the corporation and the creditor. Accordingly, the Plaintiff has standing against the corporate fiduciaries for breach of duty with respect to the trust fund.

 Defendants next challenge the "viability" of the trust fund doctrine in North Carolina. This Court concludes that the doctrine is still alive in North Carolina and therefore, Defendants' argument must fail. Despite certain commentary, the Court believes that the North Carolina Supreme Court's decision in *Snyder v. Freeman,* 300 N.C. 204, 266 S.E.2d 593 (1980), is still good law and there is no explicit statutory reference to the contrary. In the *Snyder* opinion the Court noted that

Directors of a corporation are trustees of property of the corporation for the benefit of the corporate creditors as well as shareholders. It is their duty to administer the trust ... for the mutual benefit of all parties interested.... (citations omitted) North Carolina adheres to the 'trust fund doctrine,' which means, in a sense, that the assets of a corporation are regarded as a trust fund, and the officers and directors occupy a fiduciary position in respect to stockholders and creditors, which charges them with the preservation and proper distribution of those assets. (citations omitted).

*Snyder,* 300 N.C. at 216, 266 S.E.2d 593. Notably, in a general way, this doctrine extends to cover all assets of the corporation. Here, however, Plaintiff has specifically identified a special trust account, held by Centrig/VICC for Bradson's benefit. The *Snyder* Court also noted that

Directors are liable for the misapplication of funds held in trust by the corporation, where they knew or ought to have known thereof.... Directors who mingle money collected for another with the funds of the corporation, in violation of the instruction of the owner, or who knowingly permit their subordinates to do so, whereby the fund is lost, are personally liable therefor. (citations omitted).

*Snyder,* 300 N.C. at 216, 266 S.E.2d 593. Accordingly, the Court concludes that Plaintiff has passed muster under Defendant's own test for determining the sustainability of the breach of fiduciary duty claims as against Leila, David, Stuart and Lindlau.

■ Even had Plaintiff failed to meet that burden, it has also stated and aptly supported a claim for breach of duty arising out of the joint venture on the Pomini Project. Whether or not a given set of circumstances constitutes a joint venture is generally a question for the jury. *FLIP Mortgage Corp. v. McElhone,* 841 F.2d 531 (4th Cir. 1988); *citing Smith v. Grenadier,* 203 Va. 740, 744, 127 S.E.2d 107, 110 (1962).

■ In North Carolina a joint venture has been defined as

an association of persons with intent, by way of contract, either express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term.

*Pike v. Wachovia Bank & Trust Co.,* 274 N.C. 1, 8–9, 161 S.E.2d 453, 460 (1968); *citing In re Simpson,* 222 F.Supp. 904 (M.D.N.C.1963). The North Carolina Supreme Court added that a joint venture is in the nature of a kind of partnership, and although a partnership and a joint venture are distinct relationships, they are governed by substantially the same rules. *Pike,* 274 N.C., at 9, 161 S.E.2d 453. More recently, the North Carolina Supreme Court recognized the *Pike* definitions and added that

one of the elements of a joint venture on which most, if not all, jurisdictions agree is that each party to a joint venture has a right in some measure to direct the conduct of the other *through a necessary fiduciary relationship.* Stated differently, "each joint venturer [must] stand in the relation of principal, as well as agent, as to each of the other coventurers...." 46 Am.Jur.2d *Joint Ventures* § 1 (1969 and Cum.Supp.1986).

*Cheape v. Town of Chapel Hill,* 320 N.C. 549, 562, 359 S.E.2d 792, 799 (1987).

■ The Court has reviewed the contract and determined that a joint venture was created by its terms. Each party to the contract has some measure to direct the conduct of the other, particularly with respect to the joint account agreement, paragraph 9, which requires a representative signature from each company and controls the nature of disbursements in the account. (*See* Monroe Meyerson Dep., Plaintiff's Exhibit 5.) In light of this relationship a fiduciary duty arises between the parties. The evidence establishes that Centrig/VICC may have breached their fiduciary duties as coventurers by, among other things, failing to disclose the financial condition of the companies.

In any event, the Court believes that summary judgment is not appropriate on this issue because the facts concerning the Defen-

dants' knowledge and conduct, and the circumstances in which they existed, as well as any determinations of how they relate to the legal standard of corporate fiduciary responsibility are best left for resolution by the trier of the facts at trial. *See Federal Savings & Loan Ins. Corp. v. Williams,* 599 F.Supp. 1184, 1213 (D.Md.1984).

### D. *Trust Fund/Fraudulent Conveyance Claim*

 The merits of Plaintiff's claims for a constructive trust were fully discussed in the Preliminary Injunction Order. The Court concludes that Plaintiff has sufficiently identified the property involved; alleged the necessary elements of fraud, breach of duty and wrongdoing; and, shown that it may have an enforceable interest in some of the assets transferred to Monroe, Leila and the other family members.

Defendants' summary judgment motions essentially argue that Plaintiff has not identified what VICC assets were transferred fraudulently to Leila and the others for their benefit. Defendants also contend that any money received from the corporation is merely the discharge of a valid debt which cannot therefore be a fraudulent conveyance. Therefore, Defendants conclude, "all of the payments that Leila received from Centrig and VICC during the four year period constituted partial payments of valid debts." (Defendant Leila Meyerson's Summary Judgment Brief, p. 14.)

However, Defendants' assertions are of no consequence. The Plaintiff has demonstrated pervasive commingling of corporate and personal funds and the record is saturated with evidence which compels the piercing of the corporate veil. In spite of this evidence, Defendants have been unable to properly account for the alleged "valid debts." Defendants' assert, by way of fragmentary documents and incomplete paper trails, that they have lent the companies millions of dollars, yet they cannot show which specific companies received the alleged loan amounts or, more importantly, where on the books any of the companies were given proper credit for payment against these alleged loans.

Indisputably the record divulges that numerous checks were written for hundreds of thousands of dollars to, or on behalf of, Leila, Monroe and David. Plaintiff need not prove at this juncture that all this money represents assets of VICC or that it all may have come directly from Bradson projects. It is sufficient that VICC projects were the major source of income for the companies and Bradson was a significant part of those projects before and after the Nationsbank Loan acquisition. Additionally, there is evidence that Stuart, as an officer of VICC, had knowledge of and apparently authorized checks written to other Meyerson family members. Notably, in the six month period prior to the Nationsbank Loan acquisition, nearly $220,000 was transferred to the personal accounts of Monroe and Leila Meyerson. As a consequence, the validity of the alleged debt owed to the Meyerson family members prior to the Nationsbank acquisition in June of 1992 is hotly contested.

In support of their fraudulent conveyance claims, Plaintiff also looks to the following, (1) the peculiar circumstances surrounding the transfer of the West Vaco contract, which was allegedly "negotiated" by Stuart while VICC was insolvent (*see,* Tr., p. 113–114); (2) VICC's partial capitalization of TPM; and, (3) the circular transfer of equipment assets used by VICC from RERI to TPM, all apparently without consideration. On this issue this Court noted that

> In the instant case, the Plaintiff has raised serious questions as to Mrs. Meyerson's liability as a principal, an agent, and as a co-partner to Monroe and David Meyerson. The record reflects that the assets of Centrig and its subsidiaries, including Vanderbilt, where transferred to TPM without apparent consideration as no credit for the payment from Riggers was demonstrated by the Defendants. The record also suggests that this maneuver, which, in light of the business and personal relationship between the Meyerson family members, appears to be nothing more than a reincorporation, was successful in defeating at least some of Centrig's creditors. Finally, while the actual ownership of the assets may have changed hands, it is apparent from the testimony that the management and

control of those assets remained in the hands of Monroe Meyerson.

(Preliminary Injunction Order, p. 28.) The Court reached this conclusion based upon evidence which established that Monroe caused the stock of RERI to be transferred from Centrig to himself and the circumstances surrounding the contract and equipment transfers. *See also National Carloading, supra.*

In sum, the Court concludes that there are genuine issues of material fact with respect to the nature and characterization of VICC's corporate debts and the transfer of assets from VICC to TPM which preclude granting summary judgment on Plaintiff's trust fund claim.

### E. *Other Claims*

In its fourth claim for relief Plaintiff alleges that

Monroe, Stuart, David [and] Lindlau did combine and conspire (i) to misrepresent the financial condition of VICC and VICC's ability to pay sums due, (ii) to tortiously interfere with Plaintiff's contract, (iii) to transfer corporate assets to Monroe, Leila, and TPM, (iv) and to defeat the rights of creditors and cause them financial harm, specifically the Plaintiff. Leila benefitted from the acts of these individuals and is liable for the damages caused thereby as the principal and co-partner of Monroe and David.

(Amended Complaint, ¶ 31.) On this point, Defendant Leila Meyerson argues that she cannot be held vicariously liable as there has been no evidence that she is a principal or co-partner of Monroe or David. Defendant is partially correct in that there has been minimal, if any, direct evidence on the partnership relationship between Leila and David. However, as discussed previously, there is substantial evidence of a partnership/agency relationship between Leila and Monroe and there has also been evidence that David essentially stepped into Monroe's shoes during the final months of the company's operation. According to Lindlau, David was in control of the company. (*See* Tr. p. 107, lines 9–11). The Court believes that there has been sufficient evidence from which a juror could rea-

sonably infer that David was a *de facto* partner during the time he was allegedly "running" the company. Without question, as previously established by the Court, there is sufficient evidence with respect to Leila's potential liability as a co-partner.

The vitality of Plaintiff's tortious interference claim has also been previously addressed, albeit indirectly. On this issue there is a clear-cut factual dispute involving alleged misrepresentations of the parties and whether money intended to pay Bradson was diverted to pay the personal debts and expenses of Leila and Monroe. Ample evidence has been presented for the Court to conclude that this dispute properly encircles all the Defendants and it is well settled that issues such as these depend upon credibility and are therefore not amenable to resolution on summary judgment.

Plaintiff's indemnity claim against VICC, its controlling parent, Centrig, and Monroe, Leila and David, as co-partners for the liability of their alter-egos Centrig and VICC, deals exclusively with a particular construction project known as the "Pomini Project." Defendants do not dispute the "joint venture" characterization of that project. Indeed the joint account agreement, coupled with the performance and payment bonds all suggest that this was in fact a joint venture.

The evidence also implies that VICC failed to live up to its agreement to indemnify and hold Plaintiff harmless from payments to third parties on such bonds and Monroe failed to meet his obligations as guarantor. Again, the Court believes that summary judgment is inappropriate on this claim as Leila's and David's potential liability under the principal/co-partnership/agency and conspiracy theories advanced by the Plaintiff raise genuine issues of material fact which are best decided by the fact finder at trial.

The Plaintiff's fraud claim principally focuses upon misrepresentations made by Monroe and Stuart to Bradson concerning VICC's financial situation; failure to adhere to the trust account; and, misrepresentations concerning making up past payments to the trust account. Additionally, Plaintiff's claim

that (1) Monroe failed to disclose that he had pledged VICC's contract revenues as collateral to its secured lender; (2) Monroe, Stuart, David and Lindlau each had an affirmative duty to disclose the true nature of Centrig/VICC's financial condition. These misrepresentations were apparently relied upon by Bradson and Defendants' failure to disclose was material to Bradson's decision to continue providing labor on projects for which it was not receiving payment, all to Bradson's detriment. (Amended Complaint at ¶ 41.)

Here again, the heart of the claim hinges on alleged misrepresentations of Monroe and Stuart Meyerson. Accordingly, the Court finds that summary judgment is not appropriate as to Stuart or Leila, Monroe's alleged co-partner or principal, with respect to each of the Bradson–VICC projects for reasons previously discussed.

 North Carolina imposes a duty to disclose when a relationship of trust and confidence exists between the parties. In *Ragsdale v. Kennedy*, 22 N.C.App. 509, 514–515, 207 S.E.2d 301, 305 (1974), the North Carolina Court of Appeals recognized that

It is a well settled principle of the law of fraud, applied particularly by courts of equitable jurisdiction, that it is the duty of a person in whom confidence is reposed by virtue of the situation of trust arising out of a confidential or fiduciary relationship to make a full disclosure of any and all material facts within his knowledge relating to a contemplated transaction with the other party to such relationship, and any concealment or failure to disclose such facts is a fraud.

*Id.; citing Vail v. Vail,* 233 N.C. 109, 63 S.E.2d 202 (1951).

 Defendants do not dispute that a joint venture existed between the companies on the Pomini Project or the existence of the trust account for all the other projects. As discussed above, joint venturers owe one another special fiduciary duties. Similar duties of loyalty, honesty and forthrightness are created in the agreement to establish and maintain a trust account for payments on the projects.

David Meyerson admits that at the time he was working at Centrig, both the company and its subsidiaries were experiencing cash flow problems with no viable means of solving them; VICC was engaged in customer disputes on a number of projects; and customers had not been paid. There is also evidence that Lindlau was aware of the companies' dire financial condition at this time. David also admits to being at a meeting in late 1992 between Lindsay Rivard of Bradson and Stuart Meyerson, at which time he remained silent.

There is evidence that Lindlau, Stuart and David were all acting in concert as the leadership-management group for the companies during Monroe's absence. There is evidence that together they were making the corporate decisions and that they were certainly aware of the Bradson contracts, the special relationship which existed between Bradson and VICC on the Pomini Project, and the trust account. So, with respect to David and Lindlau under the facts of this case, viewed in the light most favorable to Bradson, the Court must conclude that Bradson has demonstrated that a special relationship of trust existed between Bradson and VICC such as to create an affirmative duty to disclose. Accordingly, the Court concludes it is inappropriate to grant summary judgment on Plaintiff's fraud claims.

 In her reply brief Leila moves for summary judgment on Plaintiff's successor-in-interest claim. In a nutshell, Defendant argues that there is no evidence of a partnership or to support Plaintiff's alter-ego claim. However, as previously described, the Court finds that there has been ample evidence that both Leila and Monroe dominated and controlled Centrig and its subsidiaries, and separately formed TPM to perpetuate the asset transfer from Centrig/VICC. This transfer may have included an existing and profitable contract, cash, and equipment. The viability of this claim is linked to Plaintiff's argument in favor of piercing the corporate veil which this Court has already determined is a genuine issue for trial.

 Finally, in Leila Meyerson's reply brief, Defendant seeks summary judgment

on Plaintiff's equitable subordination claim against Leila or the other Defendants' interest in any assets of the corporate Defendants. Plaintiff makes no argument on this point. The Court has conducted an extensive review of North Carolina law and finds that this doctrine has been applied, almost exclusively, in bankruptcy proceedings pursuant to Title 11 U.S.C. § 510 and in admiralty matters involving ship mortgages. Accordingly, the Court finds that Plaintiff's equitable subordination claims must be dismissed.

### F. *Conclusion*

Having spent considerable time probing the pleadings and assessing the proof in order to see whether there is a genuine need for trial, the Court concludes that a proper determination of essentially all of Plaintiff's claims in this case, many of which will necessarily be proved in part by inference from evidence of other facts, present genuine issues for trial. Such disputes concerning genuine and material facts and requiring the resolution of disputes over the inferences to be drawn from the facts clearly involves the kinds of decisions traditionally entrusted to jurors and certainly lies within their province, thus precluding summary judgment in this case.

In making this determination, the Court is bound by the traditional allocation of functions between judge and jury. These functions were aptly described by the Supreme Court in *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), which stated:

> Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, .... The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

As the Court noted in the Preliminary Injunction Order, the lack of documentation in the record and the many apparent inconsistent representations made by the Defendants makes it difficult to make definitive findings of facts regarding the exact scope and nature of the financial dealings between the Meyerson family and the companies. Here, however, the burden rests with the Defendants to demonstrate that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. This they have failed to do. Accordingly, given the nature of the evidence in this case, the Court believes the best course in this matter is to proceed to trial. Accordingly, the Defendants' motion for summary judgment is denied as to all claims, except the claim of equitable subordination.

**NOW, THEREFORE, IT IS ORDERED** that Leila, Stuart and David Meyerson's and Kenneth Lindlau's motions for summary judgment be, and hereby are, **DENIED,** except that, Defendant Leila Meyerson's motion for summary judgment on Plaintiff's equitable subordination claim is **GRANTED.**